**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Dale YATER, Defendant-Appellant.**

**No. 84–3450.**

United States Court of Appeals, Fifth Circuit.

March 21, 1985.

---

Virginia L. Schleuter, FPD, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Peter Strasser, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before BROWN, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant William Dale Yater appeals his conviction for conspiracy to distribute cocaine in violation of 18 U.S.C. § 371. Defendant entered a conditional plea of guilty to the conspiracy charge, reserving the right to appeal the district court's denial of his Motion to Dismiss on Grounds of Governmental Overreaching and Entrapment. Finding no reversible error, we affirm the conviction.

## FACTS

Appellant Yater's motion to dismiss was heard on the basis of Yater's supporting affidavit, executed May 2, 1984, and the stipulated testimony of a government agent and two confidential informants, which revealed the following.

In August 1983, Yater traveled to Jackson, Mississippi, to take part in a high-stakes poker game. While waiting to play, appellant was introduced by a friend to Donald Smith, James McMillan, and James Marshall. Unknown to Yater, the three men were confidential informants of the Drug Enforcement Administration ("DEA"), employed by that agency to arrange undercover drug sales and to provide information concerning the activities of drug dealers.[1] The informants learned that Yater was being staked in the poker game by David Snoddy, a major drug operator in partnership with one Donald Gilbreath. The high-stakes poker game Yater had been waiting to play in never materialized, however, so he left Jackson the following day, returning to his home state of Georgia. Later that month, the informants reported the information they had received concerning Snoddy's and Gilbreath's drug operation to a special agent of the DEA, David Paige, and decided to try to arrange a drug sale between Paige and the two operators.[2] The informants began to call Yater at Days Lodge in Atlanta at a number he had given them when he was in Jackson. Yater admits that he returned their calls. Over the next four months, the informants called him frequently,[3] asking him to introduce them to Snoddy and Gilbreath so that they could arrange a drug deal. Yater states that he refused to cooperate with them.

In his affidavit, Yater states that the informants subsequently called him at his home in Georgia and asked him to return to Jackson. The informants reportedly said they would stake Yater in a poker game, and that he probably could earn as much as $30,000 playing against gamblers who would be in Jackson to attend a cock fight. Yater states that he agreed to play, and that he traveled to Jackson at his own expense in November 1983. Again, however, no card game developed.

While he was in Jackson, Yater told the informants that he was dying of cancer of the lungs and lymph nodes, and that he had an eighteen-month-old child to support.[4] Yater's affidavit and stipulated testimony present differing accounts of how the informants responded to Yater's statements.

1. The men were given a special confidential informant number by the DEA and received expense money while working on DEA projects. After a successful arrest based on information supplied by informants, the informants also would receive a contingent fee. The parties stipulated that DEA Special Agent David Paige would testify that he had told the informants that the contingent fee arrangement depended upon the following criteria: the type of violator apprehended (*i.e.*, class offender number 1, 2, 3); the value of the assets seized; the amount of the drugs seized; the value of the contraband seized. Once an arrest and the consequent seizure of assets had occurred, the DEA calculated the informants' fees according to these criteria.
 It also was stipulated that Smith and McMillan would testify that the confidential informants asked Paige whether it was possible for an informant to earn a contingent fee of $1 million. According to the stipulation, "Agent Paige responded that although he had never seen it done, that it was theoretically possible." At an earlier hearing in this case, however, Paige testified that he had told the informants that the possibility of such an enormous fee was very unlikely, and that the undercover operation first would have to bring in "millions and millions" of dollars.
 In addition, the parties stipulated that Smith and McMillan would testify on the background of the informants, which appellant considered relevant to the issue whether overreaching had occurred. The stipulation states
 "[t]hat prior to their Drug Enforcement Administration work, the confidential informants admitted running scams in which they sold peat moss to many dealers and swindled large amounts of money from the dealers. The confidential informants supported themselves with the scams. As a result of those illegitimate scams and legitimate deals McMillan grossed approximately $900,000 over approximately five years."

2. The informants arranged a sale of 45,000 pounds of marihuana to Snoddy and Gilbreath. The two men subsequently were arrested on various charges related to drug trafficking.

3. In his affidavit, Yater states that the informants made between forty and fifty calls to him over four months. The informants' stipulated testimony was that they called Yater "frequently."

4. Yater has had one lung removed because of carcinoma, a cancerous condition. He also suffers from carcinoma in his remaining lung and from cancer of the lymph nodes.

Yater stated that the informants promised him that: if his physical condition deteriorated, he and his child could move to the informants' home, where they would receive food and shelter; the informants would not let him be taken to a cancer home, which he understood as an offer for a house with a nurse until his death; upon his death, the child could live with James McMillan. The informants, however, stated merely that they expressed concern over Yater's condition and told him not to hesitate to call should he need any assistance.

Before Yater departed, their conversations turned to the subject of cocaine. According to Yater's affidavit, the confidential informants told him that he could make between $30,000 and $50,000 per month by trafficking in cocaine. After discussing the matter, Yater agreed to sell them the drug.[5] The informants put Yater in touch with Paige, who was to act as their contact. Over the telephone, Yater and Paige arranged for Yater to deliver approximately 414 grams of cocaine to Paige in Hammond, Louisiana, a city outside New Orleans, on December 1, 1983.

Testimony at previous hearings in the case reflect the following concerning the commission of the offense. Yater and a supplier, Robert Clark Nichols, obtained the cocaine from sources in Atlanta. They acquired a 1983 Eldorado Cadillac and transported the cocaine to Jackson, Mississippi. After spending the night in Jackson, the two men drove through to Hammond, Louisiana, and arrived at the site of the drug sale shortly after 6:30 p.m. on December 21. Paige and officers from the Hammond City Police Department had arrived at the Hammond Square Mall parking lot at 6:00 p.m. to await their arrival. Appellant does not challenge the government's version of the events which took place at the site of the arrest. Paige and a confidential informant approached Yater's vehicle. Appellant got out of the passenger side to meet them, while Nichols remained in the driver's seat with the door closed and the motor running. Yater and Paige talked briefly, and then appellant walked to the passenger side of the vehicle and leaned into the car through the front window. Either Yater or Nichols pressed an automatic trunk release located in the glove compartment of the Cadillac, springing the lock on the trunk. Yater and Paige opened the trunk the rest of the way, and appellant pointed inside to a bag. Paige reached in, opened the bag, and took out a large envelope. Inside the envelope, he found plastic bags which contained 414.6 grams of cocaine. Paige then broke the seal on one of the bags, sniffed the contents, and otherwise examined the supply. Yater told him that the contents were at least 85% pure cocaine, and offered Paige the cocaine for $29,000.

Yater asked where the money was located, and Paige responded that it was in a vehicle on the other side of the parking lot. Yater asked to see the cash, and the two men started to walk in the direction Paige had indicated. At that point, Paige gave a prearranged arrest signal to DEA and Hammond City Police Department officers, who immediately moved in to arrest Yater and Nichols. Appellant was arrested at 6:45 p.m. on charges of possession of cocaine with intent to distribute, and conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. The contraband was field-tested for cocaine with positive results. Laboratory tests in Dallas later determined that it was 96% pure cocaine.

Yater was initially charged under a four-count indictment on December 8, 1983. Subsequently he was charged under a Superseding Bill of Information with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and with conspiracy to travel in interstate commerce with the intent to distribute cocaine, in violation of 18 U.S.C. § 371. On April 25, 1984, Yater filed a Motion to Dismiss on Grounds of Governmental Overreaching and Entrapment. The district court held a hearing on the motion on May 2, 1984. The

---

5. Yater stated in his affidavit, "The confidential informants repeatedly stated that I could make $30,000 to $50,000 per month from 'coke.' So I got some cocaine for them."

court denied the motion, "for failure to make a sufficient showing of outrageous conduct on the part of the government agents and their confidential informants." Appellant then waived indictment by a grand jury and entered a conditional plea of guilty, pursuant to Fed.R.Crim.P. 11(a)(2), to the charge of conspiracy to travel in interstate commerce with the intent to distribute cocaine under 18 U.S.C. § 371. The plea, by consent of the court and the government, reserved the right to appeal the district court's adverse ruling on Yater's motion to dismiss. On June 21, 1984, appellant was sentenced to a term of three years imprisonment. This appeal followed.

### ENTRAPMENT

Appellant admits that he participated in the crime, but argues that his prosecution is barred because he was entrapped. He contends that the government's confidential informants deliberately implanted criminal intent or design in his mind, causing him to commit an offense that he never would have committed in the absence of government inducement. The trial court, in its May 8, 1984 memorandum, held that entrapment is an issue "to be decided by the jury, and is not amenable to pretrial motion." By pleading guilty, the court held, Yater waived the entrapment defense. We sustain the court's ruling, holding that appellant has waived the issue whether he was entrapped.

The entrapment defense focuses on the intent or predisposition of the defendant to commit the crime rather than on the conduct of the government's agents. *United States v. Henry,* 749 F.2d 203, 208–210 (5th Cir.1984) (en banc); *United States v. Webster,* 649 F.2d 346, 348–49 (5th Cir. 1981) (en banc); *United States v. Bower,*

575 F.2d 499, 504 (5th Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978); *United States v. Anderton,* 679 F.2d 1199, 1201 (5th Cir.1982). The government's provision of aid, incentive, and opportunity to commit the crime does not amount to entrapment unless it appears that the "defendant has done that which he would never have done were it not for the inducement of Government operatives." *Bower,* 575 F.2d at 504.[6]

The question of entrapment goes to the basic guilt or innocence of the defendant. In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), Justice Rehnquist explained that entrapment is based on the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of an offense but who was induced to commit them by the government. 411 U.S. at 435, 93 S.Ct. at 1644. As we stated in *Henry:*

"The concern [in entrapment cases] is thus that the accused is not guilty, since he had no criminal intent not implanted by the government, rather than that he is guilty but may avoid the consequences of his criminal conduct because of the government's undue inducement." 749 F.2d at 210.

Because entrapment involves the basic determination of guilt or innocence, it is a jury issue, and the defendant's predisposition to commit an unlawful act seldom will be " 'capable of determination without the trial of the general issue.' " *United States v. Graves,* 556 F.2d 1319, 1321 (5th Cir. 1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978) (quoting Fed.R. Crim.P. 12(b)); *United States v. Garrett,* 716 F.2d 257, 274 (5th Cir.1983), *cert. de-*

---

**6.** To establish the defense it must also be shown that the government conduct "created 'a substantial risk that the offense would be committed by a person other than one ready to commit it.' " *United States v. Goodwin,* 625 F.2d 693, 698 (5th Cir.1980) (quoting *Pierce v. United States,* 414 F.2d 163, 168 (5th Cir.1969)); *United States v. Dean,* 666 F.2d 174, 180 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, *cert. denied sub nom. Bigley v. United*

*States,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982). A prosecution, however, cannot be defeated merely because a government agent has provided the accused with the opportunity or facilities for the commission of the crime. *United States v. Tobias,* 662 F.2d 381, 384 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *United States v. Jones,* 693 F.2d 343, 347 (5th Cir.1982).

*nied,* — U.S. —, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984); *United States v. Lentz,* 624 F.2d 1280, 1286 (5th Cir.1980), *cert. denied,* 450 U.S. 995, 101 S.Ct. 1696, 68 L.Ed.2d 194 (1981); *United States v. Punch,* 722 F.2d 146, 153 (5th Cir.1983); *see also* W. LaFave & A. Scott, *Handbook on Criminal Law* § 48, 373 (1972) ("By the implied-exception theory, under which an entrapped person is innocent, the defense of entrapment is raised at arraignment by a not-guilty plea; and the factual issue of whether the defendant was entrapped is a jury question, to be determined by the jury...."). A guilty plea consequently *waives* the right to assert the defense. *Eaton v. United States,* 458 F.2d 704, 707 (7th Cir), *cert. denied,* 409 U.S. 880, 93 S.Ct. 208, 34 L.Ed.2d 135 (1972) ("[I]t is well settled that a defendant's plea of guilty admits, in legal effect, the facts as charged and waives all non-jurisdictional defenses. Entrapment is a non-jurisdictional defense on the merits and petitioners have waived their right to assert it." (citing Fifth Circuit precedents)).

 Appellant entered a guilty plea, which effectively waived his right to the defense of entrapment. Appellant seeks to avoid this result, however, by pointing out that Fed.R.Crim.P. 11(a)(2) authorizes him to plead guilty without losing his right to appeal the question whether he was entrapped. We reject this argument. Rule 11(a)(2) provides:

"**Conditional pleas.** With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty ..., reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified *pretrial motion.* If the defendant prevails on appeal, he shall be allowed to withdraw his plea." (Emphasis added).

As we have noted, however, entrapment is not an issue susceptible to *pretrial* motion and disposition. *See Eaton,* 458 F.2d at 708. By its clear terms, Rule 11(a)(2) fails to preserve the entrapment issue.

Appellant also argues that even if a strict application of Rule 11(a)(2) bars consideration of the entrapment issue on appeal, we nevertheless should hear his claim as an equitable matter. He argues that it is unjust for the district court to have accepted his conditional plea, which specifically reserved the right to appeal entrapment, and then to treat the issue as having been waived. Yater, however, does not seek, and did not seek below, to withdraw his guilty plea so that he can obtain a trial on his entrapment defense. Instead, he in effect asks this Court to order specific performance of the plea arrangement.[7] We think it is clear that this remedy is not available. In *Mabry v. Johnson,* — U.S. —, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), the Supreme Court addressed the question whether a "defendant's acceptance of a

7. At oral argument, we asked counsel for appellant, "Are you really saying that you ought to be entitled to withdraw your plea because your bargain was breached?" The attorney responded, "No, Your Honor. In answer to your specific question, I am not asking that my plea bargain be breached [sic] and that I be allowed to withdraw it and then proceed to trial. Rather, I am asking you as an appellate court dealing with the law in this issue to find as a matter of law that he was entrapped." Still later, we asked, "Are you asking for a trial on entrapment?" Again, counsel for appellant responded, "No, Your Honor. I believe that I have ample Supreme Court statements to indicate that entrapment can reach to a constitutional level of due process violation of the Fifth Amendment. If that is the case, Your Honor, then you, as a matter of law, could find entrapment, and you could as a matter of law call it overreaching."

We also observe that at the hearing on Yater's motion to dismiss the government specifically took the position that entrapment was not relevant, arguing, *inter alia,* that "entrapment is an issue for the jury, governmental overreaching is an issue for the Judge." This position was expressly sustained in the district court's May 8 memorandum ruling. Yater, who was not sentenced until June 21, at no time made any motion to withdraw his plea. *See* Fed.R.Crim.P. 32(d). Nor did he seek reconsideration of any kind below. He was, of course, at all times represented by competent counsel, as he has also been on this appeal.

We consider appellant's argument that the government's conduct was so outrageous that it violates due process—an issue separate from entrapment—*infra* in text.

prosecutor's proposed plea bargain creates a constitutional right to have the bargain specifically enforced." 104 S.Ct. at 2545. The Eighth Circuit had held that " 'fairness' precluded the prosecution's withdrawal of a plea proposal once accepted by [a defendant]." 104 S.Ct. at 2546. Concluding that "an important constitutional question had been wrongly decided," the Supreme Court granted certiorari and reversed. *Id.* The Court held that when the prosecution breaches its promise with respect to an "executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand." 104 S.Ct. at 2547. In that instance, a defendant would be entitled to withdraw his plea. The Court went on to hold, however, that the defendant's inability to specifically enforce the prosecutor's offer "is without constitutional significance." 104 S.Ct. at 2548.[8]

In this case, Yater does not seek to replead. During oral argument, we asked counsel for appellant whether Yater wished to withdraw his guilty plea. Counsel made it clear that he does not, and that he seeks only to have his plea agreement specifically enforced.[9] Because appellant has chosen not to withdraw his guilty plea, we find that the defense of entrapment has been waived. In so ruling, we do not believe that appellant has been subjected to any great injustice by waiving the defense. The fact that Yater was able to obtain $29,000 of cocaine through his own contacts without any assistance from the government, and to actively negotiate the terms of the drug deal, suggests to us that he may well have had some predisposition to commit this sort of offense and was not entrapped.

## OUTRAGEOUS CONDUCT

Appellant also contends that the district court erred in denying his motion to dismiss the criminal charges on the ground of government overreaching. He argues that the conduct of the three government informants was so outrageous that his prosecution is barred under the Fifth Amendment on due process grounds.[10] We reject this contention.

In *Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court "ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct in a case ... where the predisposition of the defendant to commit the crime was established." *Hampton v. United States*, 425 U.S. 484, 488–89, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976) (plurality construction of the *Russell* holding); *United States v. Tobias*, 662 F.2d 381, 385 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982) (construing *Russell* to hold that entrapment defense is foreclosed to one who was predisposed to commit a crime, "regardless of the type and degree of government activity involved"); *Anderton*, 679 F.2d at 1200 (same construction). Although the *Russell* Court held that predisposition to commit the crime charged forecloses the traditional entrapment defense, the Court recognized the possibility of a separate defense under the due process clause:

"[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a convic-

---

**8.** *But see United States v. Carbone*, 739 F.2d 45, 46 (2d Cir.1984), in which the court held:
"Although a defendant has no constitutional right to have an executory plea agreement specifically enforced, *Mabry v. Johnson*, ... once a plea actually is entered, and was induced by a prosecutor's promise to abstain from making a sentencing recommendation, that promise must be fulfilled." (Citation omitted).

**9.** *See supra*, note 7.

**10.** Appellant contends in his brief that his prosecution is barred under the due process clause of the Fourteenth Amendment. However, appellant does not allege, and the record does not reveal, that the alleged due process violations were committed by a state instrumentality. Therefore, we consider his due process argument only under the Fifth Amendment.

tion...." 411 U.S. at 431–32, 93 S.Ct. at 1642–43.[11]

Even as it recognized this defense, however, the Court in *Russell* wrote that the law enforcement conduct must be so outrageous that it violates "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)).

This Circuit recognized the outrageous conduct defense in *Graves, supra*, in which we wrote:

" '[A]part from any question of predisposition of a defendant to commit the offense in question, governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law or to move the courts in the exercise of their supervisory jurisdiction over the administration of criminal justice to hold that the defendant was "entrapped" as a matter of law.' " 556 F.2d at 1322 (quoting *United States v. Quinn*, 543 F.2d 640, 647–48 (8th Cir.1976)).

We considered this defense in *Tobias, supra*. In that decision, we noted that "due process can only be invoked in the rarest and most outrageous circumstances," and that each case must be considered individually under a totality of the circumstances standard, with no single factor controlling. 662 F.2d at 387. In *Tobias*, the defendant called a chemical supply company to cancel

an order of supplies which he had planned to use to manufacture cocaine. The chemical supply company actually was a front operation for the DEA. During the telephone call, the defendant, Tobias, revealed that he was canceling his order because he lacked sufficient expertise and equipment to produce cocaine. A government agent working for the front operation told Tobias that " 'almost anything would be cheaper and easier to manufacture than cocaine,' " and advised him to synthesize Phencyclidene (PCP), explaining that "making PCP was as easy as 'baking a cake.' " 662 F.2d at 383. The agent told Tobias that for $500 he would send him everything he needed to set up his PCP laboratory. Tobias agreed, and the DEA sent him the necessary chemicals. The DEA-front organization subsequently received thirteen telephone calls from Tobias to discuss problems he had encountered in the manufacturing process and to dispense advice. Two weeks after Tobias' initial telephone call, DEA agents obtained a search warrant and raided the defendant's residence, where they found PCP in a liquid state. We held that the government's activity fell " 'far short' " of violating the fundamental fairness standard of the Fifth Amendment. 662 F.2d at 386. We found that the combination of "predisposition plus active and insistent participation" set Tobias' case apart from decisions in which due process was found to bar prosecution. We did, however, note that the case set the outer limits to which the government could go in its quest to ferret out and prosecute crimes in this Circuit. 662 F.2d at 387.[12]

---

11. *See also United States v. Graves*, 556 F.2d 1319 (5th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978):

" 'A claim of entrapment on the basis of outrageous government involvement does not present any question for a jury to decide but solely a question of law for the court.' " 556 F.2d at 1322 (quoting *United States v. Quinn*, 543 F.2d 640, 647–48 (8th Cir.1976) (emphasis and citations omitted)).

12. As yet, we have not faced a case involving conduct which exceeds the outer limits of *Tobias;* we have not had an occasion to overturn a conviction on the ground that outrageous

government conduct violated the due process component of the Fifth Amendment.

We previously have cited the decision by the Third Circuit in *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), as an example of the circumstances under which we might find outrageous conduct sufficient to violate standards of fundamental fairness. *See United States v. Lane*, 693 F.2d 385, 388 (5th Cir.1982); *United States v. Tobias*, 662 F.2d 381, 386 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). In *Twigg*, the government agent suggested the establishment of the laboratory, provided the location, equipment, supplies, and know-how, and then ran the entire operation

We again examined the outrageous conduct defense in *Garrett, supra.* In an opinion by Judge Tate, we reiterated the language of *Tobias* that a due process violation will be found only in the rarest and most outrageous circumstances. More important, we identified a common thread in our decisions that a defendant cannot avail himself of the defense where he has been an *active participant* in the criminal activity which gave rise to his arrest. 716 F.2d at 275 (noting that in *Tobias*, the defendant was an "active participant" in a scheme to manufacture an illegal drug, and that in *United States v. Nicoll*, 664 F.2d 1308, 1314 (5th Cir.), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982), *overruled on other grounds, Henry, supra*, 749 F.2d at 206 & n. 2, the defendant "actively negotiated" a cocaine deal). In *Garrett*, the defendants also had been active participants in the criminal activity; one defendant "originated the idea" of calling a Houston city councilman for the purpose of setting up a bribe, and both defendants had taken part in meetings and discussions to carry out a bribery scheme. 716 F.2d at 274. We concluded that the government's conduct was not so egregious and outrageous as to subject the defendants' convictions to attack on due process grounds. 716 F.2d at 275.

We similarly conclude that the government's conduct in the instant case, even under the facts as alleged by the defendant, is not so outrageous that it violates fundamental fairness or is shocking

to the universal sense of justice. The district court in the instant case wrote:

> "Even if we were to credit Yater's stipulated testimony that the deal was initiated by the confidential informants in this action, the testimony is clear that it was Yater who made the contact with the supplier of the contraband, arranged for its delivery to [a city outside] New Orleans from Atlanta and personally appeared at the prearranged rendezvous site with the undercover agents to collect his fee and hand over the drugs. *Yater was in every respect an active participant in this transaction ....*" (Emphasis added).

Moreover, the level of government activity in the instant case is not as extreme as in *Tobias*, where we held that the government's conduct was within constitutional bounds. In *Tobias*, the government agent suggested that Tobias manufacture PCP, shipped him the necessary chemicals, and instructed him in the manufacture of the drug by telephone. In the instant case, however, Yater obtained the already-processed cocaine through his own contacts without assistance from the government and transported it himself to the site of the drug sale. Under our controlling decisions, Yater's outrageous conduct argument must be rejected.

## CONTINGENT FEE ARRANGEMENT

Yater also argues that his conviction should be reversed on the ground that the government informers were paid under a contingent fee arrangement, which provided them with a motive to coerce him to

---

with only meager assistance from the defendants. The facts of the instant case, even as alleged by appellant, do not approach the outrageousness of the government's conduct in *Twigg*. In fact, the *Twigg* court itself distinguished its facts from the situation now before us when it wrote:

> "[T]he sale of an illegal drug ... [is] a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory. In such a situation the practicalities of combating drug distribution may require more extreme methods of investigation...." 588 F.2d at 378.

*See also Twigg*, 588 F.2d at 378 n. 6 (distinguishing manufacturing operations from distribution activities when considering the due process defense); *Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) ("Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement.").

enter into a drug deal.[13] This argument is without merit.

In *Williamson v. United States,* 311 F.2d 441, 444 (5th Cir.1962), we recognized that in certain instances, we will not sanction contingent fee agreements to produce evidence against "particular named defendants as to crimes not yet committed." We cautioned against such arrangements because they might tend to cause informers to induce unpredisposed persons to commit crimes. 311 F.2d at 444. We have limited the *Williamson* holding, however, to cases in which the government directs the informant to implicate government-pretargeted specific defendants. *Brown v. Edwards,* 721 F.2d 1442, 1454 (5th Cir.1984); *United States v. Lane,* 693 F.2d 385, 387 (5th Cir.1982). In *Lane,* we wrote:

> "In the instant proceeding, it is uncontested that the paid informant was paid pursuant to a contingent fee. However, there is no indication in the record that [the informant] was to implicate government-targeted defendants. To the contrary, the record demonstrates that [the informant] randomly implicated narcotics traffickers and was not directed toward certain individuals by the DEA. *Williamson*'s progeny indicates that *Williamson* requires reversal 'only when the specific defendant was picked out for the informer's effort by a government agent.' " 693 F.2d at 387–88 (quoting *United States v. Onori,* 535 F.2d 938, 942–43 (5th Cir.1976)).

*See also United States v. Gray,* 626 F.2d 494, 499 (5th Cir.1980), *cert. denied,* 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981) (holding that although "high informant fees are and must be suspect, an informant's testimony will not be rejected unless there is evidence that he was prom-ised payment contingent upon conviction of a *particular* person" (emphasis added)); *United States v. Garcia,* 528 F.2d 580, 586–87 (5th Cir.), *cert. denied sub nom. Sandoval v. United States,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 *cert. denied,* 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976) (subsistence allowance and "alarmingly high" fee permissible so long as informant is not "promised payment of a specified sum to convict a specified suspect").

Yater does not allege that the government targeted him particularly for conviction or that the informers specifically were directed to implicate him, as this Circuit requires to establish a *Williamson* violation. Even if he had so alleged, the district court wrote that "the testimony received has been that it was the confidential informants who told David Paige [the DEA agent] that defendant Yater was in the drug dealing business and an operation could be arranged with him." The court concluded, "We do not find that Yater was specifically targeted by the DEA." In fact, appellant concedes in his brief that the informants' expected fees probably do not require reversal under *Williamson.* We find nothing in the contingent fee agreement between the DEA and its informers that requires reversal in the instant case.

For the foregoing reasons we affirm the appellant's conviction.

**AFFIRMED.**

---

**13.** Yater argues that the possibility that the informers would be compelled to induce criminal activity in unpredisposed persons is especially strong in the instant case because the informants stood to earn in excess of $1 million. We find no support for this assertion. Counsel for appellant acknowledged at oral argument that any hope the informants had of obtaining a $1 million contingent fee was in a separate criminal case against Snoddy, Gilbreath, and Arthur Tommy Nixon. Under the criteria presented to the informants for calculating contingent fees, we do not believe that they realistically expected to receive $1 million for a conviction which involved only $29,000 of drugs. Moreover, as noted above, the DEA had explained to the informants that it was extremely unlikely they would receive such a large fee in any case involving less than "millions and millions" of dollars.