UNITED STATES of America

v.

Angel CHAVEZ.

Crim. No. 83–344.

United States District Court, E.D. Pennsylvania.

Jan. 31, 1985.

Edward S.G. Dennis, Jr., U.S. Atty., and Eric Kraeutler, Asst. U.S. Atty., Philadelphia, Pa., for the government.

Ken Lange, Miami, Fla., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Angel Chavez was found guilty of possessing a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1982). Prior to trial, defendant filed a motion to dismiss for outrageous government conduct. I ordered that an evidentiary hearing be held on the motion after trial should the jury find in favor of the government and the defendant desire to supplement the evidence that had been introduced. Defendant made no such request. Accordingly, based on the trial evidence, and for the reasons that follow, the motion will be denied.

Defendant presents two distinct factual arguments, both of which he contends support the conclusion that the government's conduct was so outrageous that he was deprived due process of law. First, defendant avers that the government informant, Jimmie DeLoach, was compensated by the government on a contingent-fee basis, and that such a method of compensation created an excessive potential for unreliable testimony or activity by DeLoach. Second, Chavez asserts he was lured by DeLoach, who said he was a government official, into participating in what Chavez believed was a government sting operation to apprehend unnamed drug traffickers. Instead, he found himself arrested for the instant offense.

The conduct of law enforcement officials may indeed be so outrageous that due process principles would bar the government from securing a conviction. *See United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *United States v. Jannotti,* 673 F.2d 578, 606 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Twigg,* 588 F.2d 373, 379 (3d Cir.1978). Fundamental fairness will not permit a person to be convicted of a crime in which governmental conduct was "outrageous." *Twigg,* 588 F.2d at 379. However, a court must exercise "scrupulous restraint before [denouncing] law enforcement conduct as constitutionally impermissible." *Jannotti,* 673 F.2d at 607. This restraint is particularly appropriate in the narcotics-prosecution context, where the Supreme Court has noted:

> One can not easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic ... which is one of the major contributing causes of escalating crime in our cities.... Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.

*Hampton v. United States,* 425 U.S. 484, 495–97 n. 7, 96 S.Ct. 1646, 1652–53 n. 7, 48 L.Ed.2d 113 (1976).

Jimmie DeLoach testified that on many occasions since 1975 he has been a government informant, receiving $200 to $500 per week for this work. Sometimes he was also paid a bonus at the end of a case, dependent upon the quantity of drugs discussed or ultimately seized. In the instant case, he was paid on a weekly basis plus $2500 when the matter was concluded. Presumably relying on *Williamson v. United States,* 311 F.2d 441 (5th Cir.1962), *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965), defendant contends that this was a contingent-fee arrangement which created such a risk of questionable dealing on the part of DeLoach that a

conviction for the offense charged may not stand consistent with the fifth amendment.

In *Williamson,* the Fifth Circuit reversed the convictions of two defendants who had been charged with various liquor offenses. Government agents had promised an informant that he would be given a specified sum of money if he could arrange a purchase of whiskey from the defendants. In striking down the conviction as violative of due process, the court stated,

> Without some justification or explanation we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed. Such an arrangement might tend to a "frame up," or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration.

*Id.* at 444.

Several circuits have criticized or declined to follow the *Williamson* rationale. *See United States v. Hodge,* 594 F.2d 1163, 1166 (7th Cir.1979); *United States v. Grimes,* 438 F.2d 391, 394–95 (6th Cir. 1971). *See also United States v. Ladley* 517 F.2d 1190, 1193 (9th Cir.1975) (dictum) ("it does not appear that merely the offering of a governmental reward for activities leading to the *arrest* of the appellant is, in itself, violative of Fifth Amendment due process") (emphasis in original); Comment, 49 Va.L.Rev. 1021 (1963). These courts reject a *per se* exclusionary rule, arguing that a court's supervisory power over federal criminal proceedings should be sparingly exercised and expressing confidence in a jury's ability to consider the existence of a contingent-fee arrangement in assessing an informant's credibility. *See Grimes,* 438 F.2d at 395–96; *Hodge,* 594 F.2d at 1165–67.

Other circuits, while adopting *Williamson* in principle, have limited it in application. *See, e.g., United States v. Valle-Ferrer,* 739 F.2d 545 (11th Cir.1984) (limiting *Williamson* to those situations in which the government offers a contingent reward to an informant for securing evidence from or the arrest of a particular individual); *United States v. Cuomo,* 479 F.2d 688 (2d Cir.1973) (same), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973).

The Fifth Circuit itself has confined *Williamson* to a narrow set of circumstances, announcing two factors which militate against its application: when the government did not target specified individuals as the subject of the informant's efforts, *see United States v. Joseph,* 533 F.2d 282 (5th Cir.1976), and when the agent, not the informant, purchased the illegal substance. *See United States v. Jenkins,* 480 F.2d 1198 (5th Cir.), *cert. denied,* 414 U.S. 913, 94 S.Ct. 256, 38 L.Ed.2d 151 (1973).

The Third Circuit has yet to adopt or reject the *Williamson* rationale. Without expressing an opinion as to the soundness of the *Williamson* approach, I find that even if I were to apply *Williamson* and its progeny, defendant's due process contention must fail.

First, there was no contingent-fee agreement between the DEA and DeLoach. Although DeLoach was paid $2,500 after government agents seized the cocaine that Chavez tendered, this had not been discussed with him in advance. He was not told there would be (or that there would not be) a bonus, nor was the ultimate amount a matter of discussion or negotiation.

While it is true that DeLoach testified he was hoping he would be paid a bonus, the militating factors articulated by the Fifth Circuit are also present here. First, the cocaine purchase was discussed with Agent Richard A. Fekete, and the drug was delivered to Agent Julmarie Rzucidlo, not DeLoach. Thus the potential for unreliability was not as great as would be true if it were alleged that Chavez had tendered the drugs to DeLoach. *See Jenkins,* 480 F.2d at 1199–1200. In addition, there was no evidence presented that Fekete had targeted Chavez for DeLoach's activities. *See Valle-Ferrer,* 739 F.2d at 546–47; *Cuomo,* 479 F.2d at 692; *Joseph,* 533 F.2d at 282.

Defendant next contends the government's conduct was outrageous because DeLoach, assuming the role of a government official in line for a big government job in Washington, D.C., recruited him to play the part of a Peruvian drug smuggler capable of supplying up to 100 kilos of cocaine.[1] The stated purpose was to assist in the apprehension of drug traffickers in Philadelphia. According to Chavez, he and DeLoach met initially with government agents whom he believed to be members of a narcotics ring. They discussed the quality and price of the drugs he was to supply. They met again and Chavez was shown a quantity of money. Chavez stated that he then went to his hotel room where a man he had never seen before brought him cocaine which he believed DeLoach was supplying. Chavez then took the bag with the drugs and delivered it to one of the government agents. Chavez was promptly arrested by DEA Agent Richard Fekete.

If true, this scenario would certainly portray a situation in which a conviction could not stand consistent with due process. However, as a matter of fact, I simply cannot accept Chavez's Pulitzer Prize-eligible story. Not much of what he said made sense. Most troubling is the fact that the value of the cocaine far exceeds the amount of money that DeLoach could possibly have hoped to receive as compensation. Agent Fekete testified the cocaine seized had a "street value" of more than $800,000, and a wholesale figure of approximately $120,000. I cannot believe that DeLoach could or would go to the trouble and expense required to obtain $800,000 worth of cocaine, pay Chavez's travel expenses of $1800, and lodge Chavez in an expensive hotel, in order to receive a few week's pay from the DEA and be in line for a possible bonus.

I am mindful that the time delay between the last date on which DeLoach and Chavez met in Miami and the date on which they first spoke about drug activity was substantial. This span of time seems particularly unusual when coupled with Chavez's uncontradicted testimony that he and DeLoach had never discussed drugs in their Miami encounters. I am also aware of DeLoach's spotted background. However, I found DeLoach's story to be credible. Moreover, his testimony was only a small part of the government's case. Of far greater importance was the testimony of DEA Agents Fekete and Rzucidlo and that of a DEA agent from Florida who described the luxury apartment in which Chavez was living when apprehended. Finally, although certainly not conclusive, Chavez's flight from the January, 1984, trial sheds some light on his state of mind. Taking all these factors into account, I reject Chavez's tale as being untruthful. Consequently, I must dismiss Chavez's second contention as well as his first.

---

1. Chavez testified that while a bellman at a Miami hotel, he first met DeLoach, who was then a guest in the hotel. Chavez claimed that the two of them only once went out in a social context and never talked about drugs. According to the defendant, DeLoach helped prepare an immigration application for Chavez's brother, who was a citizen of Peru. Chavez claimed that he had a friendly relationship with DeLoach, and that when DeLoach and he talked about the sting operation—some six months after they had last seen one another—DeLoach indicated that if they were successful in apprehending drug traffickers, DeLoach would obtain an important government position and would, in turn, give a government position to Chavez.