UNITED STATES of America,
Plaintiff-Appellee,

v.

Adalberto CERVANTES–PACHECO, Jerry Wayne Nelson and William E. Nelson, Defendants-Appellants.

No. 84–2687.

United States Court of Appeals,
Fifth Circuit.

July 7, 1986.

As Amended Sept. 5, 1986.

W. Eugene Davis, Circuit Judge, filed dissenting opinion.

Melvyn Kessler, Miami, Fla., for Cervantes-Pacheco and Jerry Wayne Nelson.

Oscar J. Pena, Laredo, Tex., for W. Nelson.

Susan L. Yarbrough, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., Ann T. Wallace, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

This is a criminal appeal involving the characterization of a conspiracy and a claim that the Government hired and compensated its main witness on an impermissible contingent fee basis. We dispose of the conspiracy issue in summary fashion but conclude that the contingent fee claim is a substantial one. Because of its important implications for the standards that govern criminal investigation procedures, we treat this issue in greater depth and ultimately decide that the contingent fee arrangement employed in this case offends principles of due process.

I.   Factual and Procedural Background

In April 1984 Frank Kelly, a/k/a Frank Kennedy, a Government informer who had previously worked on more than thirty-five cases, was contacted by his supervisor, D.E.A. Special Agent Jimmy Bradley, and told to "infiltrate, gather information for intelligence, and report" on William Nelson. Tr. at 297. The activities of Nelson and a number of co-conspirators concluded on or about June 6, 1984. Defendants Nelson and Adalberto Cervantes-Pacheco were arrested, indicted, tried, and convicted of conspiring to possess 200,000 pounds of marijuana with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846, and conspiring to import marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963. They each received two four-year prison terms to run concurrently; defendant Jerry Wayne Nelson was put on proba-

tion. They jointly filed a timely notice of appeal.

Defendants make two points on appeal: (1) The Government proved at most the existence of multiple conspiracies, not the single conspiracy charged in the indictment; all defendants thereby suffered substantial prejudice and their motion for a new trial should therefore have been granted. (2) The testimony of informant Frank Kelly should have been excluded because he had been assigned to make a case against a specific defendant and was paid on a contingent fee basis; Kelly thus had a financial incentive to give damaging testimony, since the amount of his fee was based entirely on the Government's evaluation of his performance in the case, including his testimony.

## II. Single vs. Multiple Conspiracies

Appellants' first contention is without merit. The trial court carefully and thoughtfully instructed the jury on the difference between single and multiple conspiracies and left it free to make a well informed decision on the matter. In a full and fair charge to the jury covering more than five pages in the trial transcript, *see* Tr. at 1550–55, the court dealt with the same issues appellants now raise on appeal and also provided several illustrative examples taken from the trial, *see id.* at 1552–55. And, in fact, the jury acquitted two of the co-defendants, thereby indicating that it retained its powers of discrimination. We are therefore satisfied that appellants' first issue does not merit further discussion.

## III. Was the Informant's Fee "Contingent"?

Appellants' second issue requires a more detailed analysis. After examining the record in this case we conclude that the Government's dealings with informant Kelly did indeed describe an impermissible "contingent fee" arrangement that deprived appellants of their fifth amendment right to due process.

### A. Deciphering the Law of Contingent Informant Fees

Our cases on the law of contingent informant fees are based mainly on principles enunciated in *Williamson v. United States*, 311 F.2d 441 (5th Cir.1962), in which the court reversed a conviction because the Government's informant had been hired under a contingent fee arrangement.[1] *Williamson* held that

> Without some ... justification or explanation, we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed. Such an arrangement might tend to a "frame up," or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration.

*Id.* at 444. (footnote omitted).[2]

In *Williamson* a former convict, Robert Harris Moye, who had previously specialized in bootleg whiskey operations, contacted Government agents and proposed to put some of his hard-earned experience to good use because, as he succinctly put it, "I wanted to make some money, I had been in the penitentiary three years and not a bootlegger helped me one bit in the world and not a one of them paid me a nickel he owed me, or paid my wife." *Id.* at 442 (Moye deposition). Moye explained his terms of employment as follows:

> liquor dealings that they were justified in contracting with Moye on a contingent fee basis, $200.00 for Williamson and $100.00 for Lowrey, to produce the legally admissible evidence against each of them. It may be also that the investigators carefully instructed Moye on the rules against entrapment and had it clearly understood that Moye would not induce them to commit a crime, but would simply offer them an opportunity for a sale. None of these facts or circumstances were developed in the evidence, though Moye's deposition had been taken months before the trial.
> *Id.*

1. *See also United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984).

2. The court noted that under *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943), and its progeny, "it becomes the duty of the courts in federal criminal cases to require fair and lawful conduct from federal agents in the furnishing of evidence of crimes." *Williamson*, 311 F.2d at 444.

The court also elaborated on its reference to possible "justification or explanation" as follows:

It may possibly be that the Government investigators had such certain knowledge that Williamson and Lowrey were engaged in illicit

Q. How were they to pay you? Let me put it that way.

A. How was he to pay?

Q. Yes, sir, how were you to be paid, what was the agreement?

A. I was to be paid $200.00 for Big Boy, $200.00 for James McBride, $100.00 for Hogie, he's Big Boy's half brother.

. . . .

Q. What did you agree to do with Mr. Rainer and Mr. Morris? What did they tell you they wanted you to do?

A. They told me to give them the major violators and told me what they'd pay for them.

Q. For you to go out and catch them, in other words?

A. If I could catch them.

Q. And they agreed to pay you $200.00 as to Jack Williamson?

A. Yes, sir.

Q. You all called him Big Boy, I believe?

A. Yes, sir.

Q. And $100.00 as to his half brother, the Lowrey boy?

A. Yes, sir.

Q. When were they to pay you the money?

A. Wasn't nothing said about when it was to be paid.

. . . .

Q. After you had made this arrangement with Mr. Rainer and with Mr. Morris, was there any kind of a written arrangement or anything on it?

A. No, sir.

Q. Just a verbal understanding with those two gentlemen?

A. Yes, sir.

*Id.* (Moye deposition).

After the usual surreptitious arrangements, Moye managed to purchase some illicit whiskey from Jack Williamson in the presence of an undercover agent. As the court put it, "Moye made the purchase from Williamson and *produced the evidence* against both Williamson and Lowrey." *Id.* at 444–45. (emphasis added).

In a brief concurrence Judge Brown noted that *Williamson* was not an entrapment case as such. Rather, it was one in which "the means used to 'make' the case are essentially revolting to an ordered society." *Id.* at 445 (Brown, J., concurring).[3] Judge Brown also emphasized that a contingent fee arrangement need not be explicit in order to warrant condemnation: "the 'contingent fee' for a narcotics addict hardly needs to be spelled out in the terms used to trap this moonshiner. To get the stuff to feed his uncontrollable appetite, he knows that he must produce results or he will no longer be 'hired'...." *Id.* On this point Judge Brown was joined by Judge Cameron, who acknowledged that

> Every such informer knows that his day to day arrangement with the Government will continue only if he delivers the goods.... If the addict succeeds in landing some of the criminals the Government is after, he is well paid and his services will continue. If he does not, he is dropped.

*Id.* at 446 (Cameron, J., dissenting).

The interpretation of *Williamson* in later cases has been uneven and its significance has thereby been obscured. In *United States v. Garcia*, 528 F.2d 580 (5th Cir. 1976), this court cited *Williamson* for the proposition that "we have condemned the use of a contingent fee where it involves the promised payment of a specified sum *to convict* a specified suspect." *Id.* at 586 (emphasis added). In *United States v. Onori*, 535 F.2d 938 (5th Cir.1976), the court stated that in *Williamson* "we reversed a conviction for possession of illicit liquor because the informer who made the government's case had been promised a specified sum of money *for successfully incriminating* the indicated defendants." *Id.* at 942 (emphasis added). In *United States v. Lane*, 693 F.2d 385 (5th Cir.1982), we provided the following gloss on *Williamson:* "In *Williamson v. United States*, this Court reversed a conviction in which the informer assisting the Government was paid a contingent fee *to implicate* certain targeted defendants." *Id.* at

---

**3.** *Cf. id.* (Brown, J., concurring):

> For Government to offer a specific sum of money to convict a specified suspect is really more than civilized sensibilities can stand.
> . . . .
> What we hold is that, recognized as is the role of informer in the enforcement of crimi-

nal laws, there comes a time when enough is more than enough—it is just too much. When that occurs, the law must condemn it as offensive whether the method used is refined or crude, subtle or spectacular.

387 (emphasis added). Similarly, in *United States v. Yater*, 756 F.2d 1058 (5th Cir. 1985), the court noted that "We have limited the *Williamson* holding ... to cases in which the government directs the informant *to implicate* government-pretargeted specific defendants." *Id.* at 1067 (emphasis added).

■ These somewhat inconsistent cases interpreting *Williamson* draw attention to a decisive issue: Upon what is an informant's fee impermissibly "contingent"? The following possibilities suggest themselves:

(1) payment after informant's testimony is over;

(2) payment after case is over;

(3) payment dependent on informant's performance;

(4) payment dependent on outcome of case.

These possibilities are listed in the order of increasing "strength" of the contingency. # 4 describes the strongest contingency, and if payment is conditioned upon a conviction as the "outcome," then this sort of arrangement is clearly impermissible under our cases. # 3 describes a somewhat weaker form of contingency; as detailed below, we conclude that this is the sort of contingency proscribed in *Williamson* and presented by the facts of the present case.[4]

■ In *Williamson*, informant Moye testified that he agreed to "go out and catch" the defendants in return for specified sums of money. *Williamson*, 311 F.2d at 442. According to Moye, "They told me to give them the major violators and told me what they'd pay for them." *Id.* Moye "caught" the defendants "in the act," so to speak, by arranging for them to consummate an illegal transaction with him in the presence of federal agents. The *Williamson* court concluded that Moye contracted with the Government agents "to produce ... legally admissible evidence against each of" the defendants. *Id.* at 444. There is no suggestion here, or elsewhere in *Williamson*, that the informant's payments were conditioned upon the *conviction* of the defendants. Instead, it would be more accurate to say, as we put it in *Lane* and *Yater*, that Moye was paid to "implicate" the defendants. *Lane*, 693 F.2d at 387; *Yater*, 756 F.2d at 1067. Thus the *Williamson* situation comes squarely within the arrangement described in # 3 above: payment dependent upon the informant's "performance." *Williamson* prohibits the Government from picking out particular individuals for investigation and paying informants if they can implicate those suspects.[5]

**4.** Since we come to that conclusion we need not decide whether payment of an informant's fee is impermissibly "contingent" as a matter of law merely because it takes place after the informant's testimony (# 1) or after the trial (# 2). *But see* note 8 *infra*.

**5.** Even were *Williamson* to apply only in a case where the informer's fee is contingent on the government garnering a conviction, as the dissent and the Government assert, this is such a case.

A fair and unbiased reading of the record inexorably leads to the conclusion that at least a portion of the informer's fee was contingent on conviction of the defendants. The agent who had primary responsibility for establishing the fee testified unequivocally that the informer's fee was "dependent on a lot of things," including "how he testified." The government agent, moreover, when asked whether the informer's fee was in part contingent, on the ultimate result in trial, replied "sure." Supp. Rec. 32 (4th Tr.).

The informer solicited and obtained $20,000 from one of the defendants. The informer's fee was $20,000 plus expenses for some 70 days of work. That his pay, with near exactitude, matched the amount confiscated is an unlikely, and unseemly, coincidence. Had the defend-

ants been acquitted, the government would have had to return the $20,000.

In oral argument, the Government conceded as much. When asked "[w]hat about counsel's argument that the $20,000 pot would probably not have been there had the government not gotten a conviction and ... [Kelly] probably knew that," counsel for the Government failed to provide a salutary explanation:

I can't think of any response. I think that it's clear he would have gotten *something* as he had in every other case he had worked for the government on. I don't think there's any question that that was a *convenient* amount. (emphasis added).

It may have been convenient to base the informer's pay on the amount of money he was able to extract from the defendants and retain if they were convicted. But the enduring and timeless Constitutional principles of Due Process and fundamental fairness at trial cannot rest on the evanescent conveniences of paying government informants. It is plain that at least a portion of informer-Kelly's fee was contingent on conviction of these defendants. Therefore, irrespective of whether the *Williamson* rule is triggered when the contingency fee is predicated on "implication" or "conviction," the fee paid to the informer in this case was impermissibly and unconstitutionally tainted.

## B. Pre-targeting Specific Individuals

■ It emerges unmistakably from the record in this case that the Government's actions are of the sort proscribed in *Williamson*. As we have acknowledged elsewhere, "*Williamson* has been subsequently limited to require reversal of a conviction only when the specific defendant was picked out for the informer's efforts by a government agent." *Onori*, 535 F.2d at 942 (citing four 5th Circuit cases). That initial condition is easily met in the present case.

Informant Kelly testified at trial as follows:

Q. All right. What were your instructions? What were you asked to do?

A. I was asked to infiltrate, gather information for intelligence, and report.

Q. Any particular individual here in Laredo?

A. Yes. Bill Nelson.

Tr. at 297. Later in his testimony Kelly stated that "my job was to infiltrate and report on Bill Nelson." *Id.* at 312. In the face of this uncontradicted testimony the Government wisely concedes that Nelson was indeed pre-targeted: "In the instant case, informant Kelly was instructed to 'infiltrate, gather information for intelligence, and report' on appellant William Nelson (T. 297), and it therefore appears that Nelson was, in fact, a government-pre-targeted potential defendant." Appellee's Brief at 31.[6]

## C. Contingent Fee Payments

The record in this case also supports a finding that the Government set up an impermissible contingent fee arrangement with its informant. As in *Williamson*, the informant's payment depended on his performance. In fact, it appears that this case involves an even stronger form of contingency than *Williamson* did. Here, the informant's "performance" included not merely his undercover operations—as in *Williamson*—but also extended to his performance while testifying at trial, thereby directly tainting the factfinding process itself.

Informant Kelly testified as to his terms of employment as follows:

Q. And how are you paid, sir?

A. I'm paid after a case is over with, anywhere from when the case is over to a year later, depending on Washington. It's Washington's job to tell ... the Agency that I'm working for would request an amount of money and Washington would approve or disapprove that amount, depending on the way they feel I testified or the way they feel about my infiltrating, gather information, report that information, and testify.

Tr. at 295 (emphasis added). Later Kelly clarified that testifying at trial was an integral part of his assignment, and one that determined whether he would be paid:

A. Initially, when they requested my services, he said, "Will you testify," and I said, "Yes." That's it.

Q. So you knew then that it's part of your job in this case to testify about your investigation?

A. Yes, sir.

Q. And you knew that you wouldn't be paid until the case was concluded; is that correct?

A. Yes, sir.

Q. And you knew that conclusion of this case meant your testimony in this case?

A. Yes, sir.

*Id.* at 418–19.

Later at trial agent Bradley testified on the factors he considered in determining how much to pay Kelly. This testimony makes clear that the quality of Kelly's testimony determined whether he would be paid:

Q. You pay for performance, what they perform?

A. That is correct.

Q. Now, when you figure out this recommendation, do you isolate the different things that the informer has done for you or do you consider it as a whole?

A. I evaluate different aspects of the case and what his participation was in such case.

---

**6.** The dissent asserts that William Nelson's co-defendants, Jerry Wayne Nelson and Cervantes-Pacheco, should not in any event come within the *Williamson* rule because they were not pre-targeted by the Government. We respectfully disagree.

The jury found that there was a single conspiracy. By the very nature of a conspiracy, all the defendants were inextricably linked, and therefore "sufficiently connected" so that the *Williamson* rule must be applied to exclude the tainted testimony for *all* the defendants. *See United States v. Dickens*, 524 F.2d 441, 446 (5th Cir.1975), *cert. denied sub nom. Glenos v. United States*, 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976).

Q. Do you weigh different aspects against each other when you formulate a final figure, or is there one that just overrides all of them?

A. No, I would say that you take them and combine them altogether and you come up with an evaluation of what you think it's worth.

Q. Okay. So, if I understand you correctly, you were going to weigh these factors in your own mind?

A. That is correct.

Q. Now, are there any set procedures or guidelines that you're aware of that would assist you in weighing these different factors of performance?

A. There are no set guidelines. It's strictly up to my discretion.

Q. Okay. I would imagine that there are numerous factors you're going to consider?

A. Yes. Each case is different.

Q. One would be, for instance ... what, the availability of Mr. Kelly whenever you sought him? In other words, when you picked up the phone, Mr. Kelly answered and he was always there whenever you needed him? That would be a factor, wouldn't it?

A. That would be a factor, yes.

Q. Okay. And the responses that you got from Mr. Kelly, as to whether or not they were complete, that would be a factor?

A. Yes.

Q. And whether or not they were accurate, that would be a factor?

A. Yes.

Q. And his willingness to repeat these responses at a later time would be another factor, Mr. Kelly's performance?

A. You mean, testifying? Yes.

Q. To repeat it anywhere?

A. Right.

Q. You certainly don't want Mr. Kelly to have the authority to say when he will repeat his responses and when he will not; is that correct?

A. I believe he does not have that authority.

*Id.* at 660–62.

Further, it even appears that if Kelly performed well enough on the stand, his reward would be the very $20,000 that the Government seized in this case:

Q. (Mr. Zelman resuming) When you make your recommendation, you're going to wait until the end of the case?

A. Yes.

Q. This case is not over, is it?

A. The case is never over until the trial is over.

Q. Okay. And you are right now in the process of evaluating Mr. Kelly; is that correct?

A. I've already evaluated Mr. Kelly.

Q. How did he do?

A. He did great.

Q. You're going to recommend a lot of money for him?

A. I sure am.

Q. What figure?

A. *I'm going to recommend that he gets that twenty thousand dollars he seized.*

Q. Now, before Mr. Kelly testified, had you had any figure in mind?

A. No.

Q. So you were going to wait until Mr. Kelly's testimony before you figured how much you were going to recommend he get?

A. That is correct.

*Id.* at 662–63 (emphasis added). Thus, the quality of the informant's testimony determined not only *whether* he would be paid but also *how much* he would be paid. Needless to say, such an arrangement provides strong financial incentives for giving damaging testimony. Indeed, one might fairly remark that this case provided the entrepreneurial informant a splendid opportunity to "write his own ticket." As the *Williamson* court noted, "The opportunities for abuse are too obvious to require elaboration." 311 F.2d at 444.[7]

---

7. The dissent posits that even if there were an impermissible contingency fee, the fee would be justified "[b]ecause of the government's reasonable suspicion that Nelson was smuggling drugs." At 697. It is true that the Government in this case could reasonably suspect that there was wrongdoing prior to launching its investigation. It is also true that in past cases we have recognized that reasonable suspicion may justify the use of a contingency fee. *Harris v. United*

*States*, 400 F.2d 264, 266 (5th Cir.1968); *Sears v. United States*, 343 F.2d 139, 144 (5th Cir.1965); *Hill v. United States*, 328 F.2d 988, 989 (5th Cir.1964), *cert. denied*, 379 U.S. 851, 85 S.Ct. 94, 13 L.Ed.2d 54 (1964); *see Williamson*, 311 F.2d at 444.

But we have also recognized that reasonable suspicion, standing alone, may not be enough to justify an otherwise impermissible contingency

## IV. Conclusion

We conclude on the basis of the foregoing analysis that the testimony of the Government's main witness, informant Kelly, is inherently untrustworthy and should have been excluded as such.[8] We find no error in the trial court's handling of the conspiracy issue; but on the contingent fee issue we reverse and remand the case to the district court for a new trial.[9]

One of the basics of our jurisprudence is the search for truth, and by this is meant not the purchased truth, the bartered-for truth, but the unvarnished truth that comes from the lips of a man who is known for his integrity. A corollary of our search for truth, a component thereof, is that the plaintiff or defendant, prosecution or defense, as the case may be, vouches for the truthfulness and the integrity of its witnesses. The government in its prosecutorial efforts should be like Caesar's wife, above or beyond reproach. At the very least, the court must tell a jury that the words of a witness have been in a sense purchased if he will be paid, more or less, depending upon how effective his putative truth-telling sells itself to the jury. It may be that we must live with informers. It may be that we must live with bargained-for pleas of guilty. But we do not have to give a receipt stamped "paid in full for your damaging testimony" or "you will be paid according to how well you can convince the jury even though it be in the face of lies."

It is true that the precedents we cite are timid in their approach to this problem, fearful that somehow the condemnation of contingent fee arrangements will destroy our criminal justice system. If that be true, then our system of finding the truth is pallid and weak and not to be trusted. Trustworthiness is a keystone and a hallmark of any judicial system that seeks recognition for its role in a civilized society. The time has come to announce boldly and firmly that our juridical search for the truth cannot be reconciled with the virtual purchase of perjury.

REVERSED AND REMANDED FOR A NEW TRIAL.

W. EUGENE DAVIS, Circuit Judge, dissenting:

The court in today's case reverses three convictions because they are based in part upon what it considers tainted testimony of

---

fee. Rather, in order to justify the fee, the investigation must be of unusual difficulty. *See Sears,* 343 F.2d at 144. Here, the Government has not argued, nor does the record support an argument, that the investigation was in some way unusually difficult.

Although reasonable suspicion standing alone may sometimes be sufficient to justify a fee contingent on successful *investigation,* this justification is irrelevant and inapposite when the fee is made contingent on the informer's *testimony* at trial. In none of our prior cases have we found it necessary to reach this question, since this is the only case since *Williamson* was decided in which the informer's fee was premised, at least in part, on the quality of the informer's testimony and on the defendant's conviction.

8. We see nothing in *Williamson* or later cases that bars an arrangement under which an informant involves himself with a "targeted" individual and is later compensated, after the job and testimony are over, according to an objective assessment of the actual time and effort expended and the quality of the services. We would not condemn a payment based on the quality of the informant's work, including the quality of the testimony, so long as that evaluation of quality was determined by the informer's ability to *accurately* and *truthfully* recall the facts. That is not what happened here.

9. The introduction of the tainted testimony was not harmless error. The standard for showing that a constitutional error was harmless is appropriately stringent. A "conviction should ... be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless *beyond a reasonable doubt.*" *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (*quoting Delaware v. Van Arsdale,* —— U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (emphasis added); *see Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

It is true that much of the informer's testimony was corroborated. *See* at 697–699. But informer-Kelly was the Government's star performer at trial. The case revolved around Kelly and his bartered for testimony. As Judge Davis notes, "Kelly remained on the witness stand for the better part of a day and testified in excruciating detail about his activity ...." At 700. The Government heavily relied on Kelly's testimony to convict the defendants. As the Government prosecutor put it at trial, "Kelly will be the one ... that will tie it all up." Tr. 272. Reading the record as a whole, we cannot confidently say that without Kelly's testimony the Government would have proved beyond a reasonable doubt that the defendants conspired to bring marijuana into the United States.

a paid informant. The majority concludes that the informant, Kelly's, testimony is tainted because the payment to him was "contingent" on his performance in gathering evidence and testifying against appellant William Nelson. I disagree with this conclusion for the following reasons: (1) *Williamson* and its progeny are concerned with fees that are contingent on *conviction* rather than fees contingent on overall *performance* of an informant in implicating a pre-targeted individual; (2) the government had reason to believe that Nelson was engaged in drug smuggling when it hired the informant Kelly. This knowledge of the government justified its contingent fee arrangement with the informant Kelly. (3) Even if a conviction is based in part on the testimony of an informant who is improperly paid a contingent fee, we have consistently affirmed the conviction if the informant's testimony is corroborated by clear, independent evidence. Kelly's testimony was a relatively minor part of the government's case and the conviction of the three defendants in this case is supported by ample evidence independent of Kelly's testimony. (4) The conviction of appellants, Jerry Wayne Nelson[1] and Cervantes, should not be reversed in any event because the government did not ask Kelly to investigate or produce evidence against them. I will discuss each of these points in turn.

## I.

### A.

The majority concludes that the government is prohibited from paying an informant to obtain evidence and testify against an individual if the payment is made contingent on the informant's overall performance. Although the cases do not speak with a single voice on this point, I am persuaded that *Williamson* and its progeny are concerned with the propriety of paying a fee to a government informer only if that fee is contingent on the *conviction* of a pretargeted individual.

In *Williamson*, it is difficult to determine whether Judge Rives, the author of the opinion, considered the payment to the informer contingent on the conviction of the suspects. It is clear, however, that

Judge Brown had this meaning in mind. In his concurring opinion he stated: "For government to offer a specific sum of money *to convict* a specified suspect is really more than civilized sensibilities can stand." *Williamson*, 311 F.2d at 445 (emphasis added).

In *United States v. Garcia*, 528 F.2d 580, 587, (5th Cir.), cert. denied sub nom. *Sandoval v. United States*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976), we clarified our statement in *Williamson:*

> [S]pecifically we have condemned the use of a contingent fee where it involves the promised payment of a specified sum *to convict* a specified suspect.
>
> But we have refused to extend this ruling to the situation where an informant is paid a subsistence allowance and given a reward, as long as there is no evidence that he had been promised a specific sum *to convict* a particular person.

(Emphasis added, citations omitted.)

Similarly, in *Henley v. United States*, 406 F.2d 705, 706 (5th Cir.1969), we stated: "The record also shows that while Turner was paid his expenses from time to time, there was no contingent fee arrangement between him and the federal agents whereby he would be paid a specified sum *to convict* a specific suspect. Thus the method of payment was not the kind condemned by this Court in *Williamson....*" (Emphasis added.)

The majority acknowledges that the fee paid Kelly in this case was not contingent on Nelson's conviction. The record amply supports the district court's finding that the fee depended on Kelly's overall performance in infiltrating the conspiracy, gathering evidence and testifying against Nelson. 5 Rec. 295; 6 Rec. 660–63. Because the payment to Kelly was not contingent on Nelson's conviction, the *Williamson* rule has no application.

### B.

Appellants do not contest the district court's finding that the government had reason to believe that Nelson was smuggling drugs when it hired the informant Kelly. In ruling on appellant's motion to

---

**1.** I will use Jerry Wayne Nelson's full name when referring to him. Nelson used alone will refer to appellant William E. Nelson.

dismiss the indictment because of Kelly's testimony, the district court summarized its view of the evidence relating to the reason the government hired Kelly:

> In other words, the government didn't just go around one day and said, "let's go make a case on Nelson." They had some information to believe, as I understand the facts, that he was involved in this and they never heard back from him and they were becoming suspicious about him and therefore started following around and surveilling him and so forth, and this fellow ... this informant doesn't get on the scene until April, which apparently is clear already that they were already surveilling him in Arizona. They were taking pictures of him and they were following him around, suspecting monkey business.

6 Rec. 699–700.

In *Williamson,* the court noted that knowledge by the government that the targeted individual was engaged in illicit activity could justify a contingent fee agreement with an informer:

> It may possibly be that the Government investigators had such certain knowledge that Williamson and Lowrey were engaged in illicit liquor dealings that they were justified in contracting with Moya on a contingent fee basis....
>
> Without some such justification or explanation, we cannot sanction a contingent fee agreement....

311 F.2d at 444.

In *Hill v. United States,* 328 F.2d 988, 989 (5th Cir.), cert. denied, 379 U.S. 851 (1964), we found that the justification suggested by *Williamson* was met "when the government showed, as it did here that (1) the accused had a past record (in this case there were past convictions for the same offense), and (2) that neighbors had informed and complained to an agent of the accused's activities."

In *Sears v. United States,* 343 F.2d 139, 144 (5th Cir.1965), we held that hiring an informer on a contingent fee arrangement to produce evidence and testify against a sheriff was justified because the detection of illegal activities on the part of a state official was difficult and the agents who hired the informer had adequate grounds to believe that the suspect was engaged in illegal activity.

In *Harris v. United States,* 400 F.2d 264, 266 (5th Cir.1968), we reaffirmed our earlier statement in *Hill* that knowledge by law enforcement officials that the accused is engaged in illegal activity is a sufficient justification for hiring an informer on a contingent basis.

Because of the government's reasonable suspicion that Nelson was smuggling drugs, it logically focused its investigation on him. In conducting this investigation, the government was justified under *Williamson* and later circuit authority in hiring Kelly to infiltrate the conspiracy and obtain evidence against Nelson that could be used in a criminal trial.

## C.

Even if the fee paid Kelly *was* improper as violative of the *Williamson* rule, the conviction should nevertheless be affirmed because of the overwhelming independent evidence that supports Nelson's conviction. See *Garcia,* 528 F.2d at 587 and cases cited in note 4 of that opinion.

In *Henley v. United States,* 406 F.2d 705, 705–06 (5th Cir.1969), one of the reasons we declined to reverse the conviction was because "the combined testimony of agent Navarro and Michael Henley himself fully corroborated [the informant's] testimony. Thus the jury was not required to base its verdict solely on the testimony of a man who admittedly is not a sterling character."

In his testimony, Nelson admitted most of the important facts relied on by the government to support its contention that Nelson was a participating member of the drug smuggling conspiracy. Nelson asserted a narrow defense of lack of intent to the government's broad conspiracy charge. Kelly's testimony had little bearing on this defense. A summary of the government's case, the admissions of Nelson and a consideration of the nature of Nelson's defense will readily demonstrate that this is true.

The government's evidence at trial revealed that Nelson and his co-defendants were engaged in a conspiracy to import marijuana from Colombia into the United States from December 1983 until June 1984. Nelson's role in the conspiracy was to provide an airplane and fly it, loaded

with drugs, from Colombia to the United States. The government contended that Santos and Cervantes agreed to fund the enterprise and provide the Colombian source for the marijuana. These two men, or the organization they represented, agreed to pay Nelson for his services.

Ronald Sharp knew both Nelson and Santos and in December of 1983, Sharp introduced Nelson to Santos. During the course of the conspiracy, Sharp continued to work for Santos and had extensive dealings with Nelson. Sharp agreed to cooperate with the government and was the government's key witness at the trial.

The government focused on four episodes in which the conspirators planned to smuggle drugs into the United States. In the first episode, Sharp testified that Nelson agreed to furnish his DC–7 airplane and fly several tons of marijuana from Colombia into the United States. According to Sharp, he delivered $140,000 to Nelson on December 26 to partially compensate Nelson for transporting the marijuana from Colombia to the United States. Nelson admitted receiving a payment but contended he received $86,000 instead of $140,-000. Nelson was instructed to meet Santos in Panama to get further instructions on where to pick up the marijuana. Nelson failed to appear in Panama and the shipment was cancelled. An angry Santos directed Sharp to get his $140,000 back from Nelson. When confronted by Sharp, Nelson explained that he had crashed his airplane in the Cancun, Mexico area while he was en route to meet Santos in Panama. Nelson admitted at trial that he gave this excuse to Sharp but contended that it was a lie. He testified that he never left the United States. On January 3 or 4, 1984, Santos, Cervantes and Sharp met with Nelson. Santos demanded that Nelson return the money or repay him with work. Nelson agreed to work for Santos. Santos and Cervantes returned to Miami and Sharp remained in Laredo, Texas to keep an eye on Nelson.

Nelson testified that as soon as he received the $86,000 from Sharp he immediately turned it over to representatives of the anti-communist Nicaraguans ("Contras"), in whose cause he sympathized. He explained that the pro-communist Sandinistas financed their government in large measure through drug smuggling operations. He told the jury that he pretended to participate in the plan to smuggle drugs for three reasons: First, by thwarting Santos' smuggling activities he would deprive the Sandinistas of financial support. He also proposed to bilk as much money as possible from the smugglers and contribute it to the Contras. He also hoped that his apparent cooperation with Santos would help him get four of his pilots released from a Mexican jail.

The next smuggling episode involved a plan to fly to Colombia via Jamaica and return to the United States with approximately three tons of marijuana. In early January 1984, Nelson flew to Kingston, Jamaica, where Sharp met him. Nelson was given instructions on where to pick up the marijuana in Colombia and on January 18, Nelson departed Kingston for Colombia to pick up the marijuana. Nelson was instructed to fly the marijuana to Big Whale Key, in the Bahamas where he was to land at night on a lighted strip and unload the marijuana in waiting boats. Nelson told Sharp in Miami on January 19, that when he arrived at the designated landing strip at night, he found no lights or boats and he instructed his crewmembers to jettison the marijuana on Big Whale Key.

At trial, Nelson denied that he flew to Colombia and picked up the marijuana. He contended this story he told Sharp was a complete fabrication.

Despite the first two misfires, Nelson was again asked to fly approximately three tons of marijuana from Colombia to the United States in early February 1984. The plan for this trip was virtually identical to the previous trip. Nelson was instructed to fly to Jamaica, get instructions on where to pick up the marijuana and then fly the marijuana to a lighted landing strip on Big Whale Key. The day after Nelson was scheduled to deliver the marijuana, he

called Sharp from Jamaica and told him that because the lights were not lit on the landing strip at Big Whale Key, he was unable to land and his crew was again forced to kick the marijuana out of the airplane.

Nelson admitted during trial that he picked up this load of marijuana in Colombia but he contended that he and his crew kicked the marijuana out of the airplane shortly after take-off in Colombia. He again explained that this was part of his plan to aid the Contras and harm the Sandinistas.

The final episode involved a plan to fly a large load of marijuana from Colombia into Monterrey, Mexico and then transport it in smaller loads into the United States. Santos told Nelson he wanted him to acquire a DC–7 and fly 20,000 pounds of marijuana to Mexico in the first flight with the possibility of nine similar additional flights. In order to transport this quantity of marijuana, Nelson bought a DC–7 airplane in Arizona, equipped the airplane with specially designed fuel tanks to increase the range of the aircraft and certain hi-tech equipment to assist in the smuggling operation.

Kelly infiltrated the conspiracy on April 8, 1984 after the aircraft had been purchased and equipped. Nelson needed another pilot for this trip and he was instrumental in having Kelly hired by Santos in May to assist in flying this load of marijuana from Colombia. Kelly testified about the plans to transport this load of marijuana. Some of the details of the plan for this trip that Kelly referred to in his testimony include the amount of money he and Nelson were to be paid, aircraft repairs they planned to make, steps they took to obtain a crew, the route they proposed to fly, the location of refueling stops and preparation of bogus documents so the plane could land in Mexico.

Nelson admitted that he participated with the other members of the conspiracy in planning the movement of this load of marijuana. Nelson contended however that he went along with the plan to spoil it so he could assist the Nicaraguan Contras.

Sharp's testimony was consistent with the testimony of Kelly and with Nelson's admission of the role he played in planning this episode.

In summary, Kelly's testimony was not of major importance to the prosecution. It did not assist the government in establishing the first three episodes; his testimony only related to planning the final episode. Nelson did not dispute the critical parts of Sharp's or Kelly's testimony. Nelson maintained that he was playing the role of a participant in the scheme but that he never intended to import drugs into the United States. The jury apparently considered Nelson's defense incredible and concluded that Nelson intended to fly the missions he admitted that he planned. Our cases do not support reversal of these convictions under these circumstances.

### D.

Kelly's testimony in no event justifies the reversal of the convictions of William Nelson's co-defendants, Cervantes and Jerry Wayne Nelson. *Williamson* explicitly limits application of its prohibition to the production of evidence against "particular named defendants as to crimes not committed." 311 F.2d at 441. We have consistently refused to give the benefit of this rule to individuals who were not singled out by the government for the informant's effort. *United States v. Yater*, 756 F.2d 1058, 1067 (5th Cir.1985); *United States v. Lane*, 693 F.2d 385, 388 (5th Cir.1982); *United States v. Onori*, 535 F.2d 938, 942–43 (5th Cir.1976). The government did not ask Kelly to investigate and obtain evidence against Cervantes or Jerry Wayne Nelson and consequently they cannot claim the benefit of the *Williamson* rule.

In *United States v. Dickens*, 524 F.2d 441 (5th Cir.1975), *cert. denied sub nom. Glenos v. United States*, 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976), the government hired an undercover informant to investigate and produce evidence against Morrison. The informant, during the course of the investigation also developed evidence against two additional men who

were indicted and tried with Morrison. The district court instructed the jury that if it determined that the government agreed to pay the informant a fee contingent upon conviction of Morrison, it should acquit Morrison. The court added, however, that this instruction had no application to Morrison's co-defendants. On appeal, the convictions were affirmed. We held that the fee paid the informant was not a contingent fee prohibited by *Williamson.* We also stated that "the court's action in limiting its 'contingent fee informer' instruction to the defendant Morrison was not reversible error." *Id.* at 447.

Because the government did not single out Jerry Wayne Nelson or Cervantes for investigation by Kelly, the *Williamson* rule should in no event apply to them.

### II.

It is not easy for me to determine what the court holds in this case. First the majority soundly and at some length, criticizes the government for setting up an impermissible contingent fee arrangement with its informant and concludes that "this case involves a stronger form of contingency than *Williamson* did." P. 693. After condemning the payment to Kelly as a prohibited one under *Williamson,* the majority in a footnote then asserts that what it finds wrong with the use of Kelly's testimony is the failure of the government to establish by objective evidence—subject to judicial review—that the fee paid to Kelly was reasonable. The majority does not favor us with citation of authority that reveals the source of the court's power to review the reasonableness of such a payment or the standard we should use in such a re-

view. If, however, the court wishes to review the reasonableness of the payment, I do not know what additional facts it needs for such a review. Kelly remained on the witness stand for the better part of a day and testified in excruciating detail about his activities from April 8 until June 6, 1984, while he worked in an undercover capacity. The DEA agent who hired Kelly was also cross-examined extensively about how he determined the sum he would recommend to his superiors that Kelly should receive. The court has only one reason to be concerned with the amount of the government's payment to Kelly and that is whether the payment affected his credibility as a witness. Ordinarily the jury judges the credibility of the witnesses. The majority suggests no reason we should depart from that rule in this case and no reason occurs to me.

Counsel's right to cross-examine Kelly and the DEA agents instrumental in hiring him on the subject of Kelly's compensation was not restricted by the district court. No contention is made that the government withheld information on this subject. It was up to the jury to judge Kelly's credibility based on this evidence and the court has no need for additional information if indeed any exists.

### III.

The *Williamson* prohibition against paying an informant a fee contingent on his performance is not an unrestricted one in this circuit. I have not found a single reversal of a conviction in this circuit based on this rule since *Williamson* was decided.[2] At least three of the well-accepted

**2.** I also did not find a single decision from another circuit that reversed a conviction because it was based on the testimony of a paid informer who received a contingent fee. Some of the courts expressly declined to decide whether to adopt the *Williamson* rule: *United States v. James,* 494 F.2d 1007 (D.C.Cir.), *cert. denied sub nom. Jackson v. United States,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *United States v. Chavez,* 620 F.Supp. 1516 (D.C.Pa.1985), *aff'd mem.,* 787 F.2d 584 (3d Cir.1986); *United States v. Reynoso-Ulloa,* 548 F.2d 1329 (9th Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56

L.Ed.2d 769 (1978). Others determined that the facts presented exceptions to *Williamson* which precluded its application: *United States v. Jett,* 491 F.2d 1078 (1st Cir.1974); *United States v. Cuomo,* 479 F.2d 688 (2d Cir.), *cert. denied sub nom. Rizzo v. United States,* 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973); *United States v. McCaghren,* 666 F.2d 1227 (8th Cir.1981); *United States v. Frazier,* 434 F.2d 238 (10th Cir. 1970); *United States v. Richardson,* 764 F.2d 1514 (11th Cir.), *cert. denied sub nom. Crespo-Diaz v. United States,* —— U.S. ——, 106 S.Ct.

exceptions to *Williamson* are established in this case: the fee to Kelly was not contingent on conviction; the government had reasonable suspicion that Nelson was engaged in drug smuggling when it hired Kelly; and the conviction was supported by strong evidence independent of Kelly's testimony. Jerry Wayne Nelson and Cervantes fall within an additional exception: they were not targeted by the government for the informant's efforts. The majority may not be pleased with the exceptions we have placed on the *Williamson* rule but they are not entitled to disregard them. Because I cannot read the circuit authority as supporting the reversal of these convictions, I respectfully dissent.

---

320, 88 L.Ed.2d 303 (1985). At least two circuits have rejected the *Williamson* rule.

In *United States v. Grimes*, 438 F.2d 391 (6th Cir.), *cert. denied*, 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155 (1971), the Sixth Circuit concluded that it made no sense to prohibit the testimony of a paid informant and yet permit the testimony of a co-conspirator who had been promised immunity or other favorable treatment in return for his testimony. The court concluded that rather than exclude the paid informant's

testimony, the monetary benefit the witness expected to receive should be considered by the jury in determining that witness's credibility, just as immunity or a promised favorable sentence is considered when the cooperating co-conspirator testifies. Similarly, the Seventh Circuit in *United States v. Hodge*, 594 F.2d 1163 (7th Cir.1979), held that the "method of payment is properly a matter for the jury to consider in weighing the credibility of the informant."